UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

DAMIAN TREFFS,

                                        Plaintiff,

                     -v-

THE CITY OF NEW YORK, New York City Police
Department Officer ("P.O.") ODED ELIAV (Shield
No. 3532), Deputy Inspector ("D.I.") DANIEL
MULLIGAN, Sergeant ("SGT.") JOSEPH MILLER
(Shield No. 3580), P.O. DENNIS FERRER (Shield No.
2919), SGT. FRANKLIN TORRES (shield number of
said officer not being known to the plaintiff at this time),
Captain ("CPT.") "FNUK" TAYLOR, P.O. "FNUK"
SANTOS, P.O. "FNUK" GONZALEZ, SGT. "FNUK"
LAU (the first names and shield numbers of Cpt. Taylor,
P.O. Santos, P.O. Gonzalez, and Sgt. Lau not being known
to the plaintiff at this time), CPT. MARK MOE, SGT.
RICHARD ROE and P.O. JOHN DOE (the names Richard
Roe and John Doe being fictitious, as the true names and
shield numbers are not presently known), in their individual
and official capacities,

                                  Defendants.

------------------------------------------------------------------x

**FIRST AMENDED COMPLAINT
AND DEMAND FOR
A JURY TRIAL**

Index No. 12-CV-3030 (HB)

        Plaintiff DAMIAN TREFFS, through his attorneys DAVID B. RANKIN and DEBORAH

B. DIAMANT of the Law Office of Rankin & Taylor, as and for his first amended complaint,

does hereby state and allege:

## PRELIMINARY STATEMENT

1.    This is a civil rights action brought to vindicate plaintiff's rights under the Fourth and

       Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

       Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff DAMIAN TREFFS' rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis seized, detained, arrested, searched and used unlawful force against him. By reason of defendants' actions, including their unreasonable and unlawful searches and seizures, plaintiff was deprived of his constitutional rights.

3. Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that plaintiff's claim arose in the Southern District of New York.

6. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

7. Plaintiff DAMIAN TREFFS is, and was at all times relevant to this action, a resident of the County of Queens in the State of New York.

8. Defendant THE CITY OF NEW YORK ("CITY"), is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

9. New York City Police Department Officer ("P.O.") ODED ELIAV (Shield No. 3532), Deputy Inspector ("D.I.") DANIEL MULLIGAN, Sergeant ("SGT.") JOSEPH MILLER (Shield No. 3580), P.O. DENNIS FERRER (Shield No. 2919), SGT. FRANKLIN TORRES (shield number of said officer not being known to the plaintiff at this time), Captain ("CPT.") "FNUK" TAYLOR, P.O. "FNUK" SANTOS, P.O. "FNUK" GONZALEZ, SGT. "FNUK" LAU (the first names and shield numbers of Cpt. Taylor, P.O. Santos, P.O. Gonzalez, and Sgt. Lau not being known to the plaintiff at this time), CPT. MARK MOE, SGT. RICHARD ROE, and P.O. JOHN DOE (the names Mark Moe, Richard Roe and John Doe being fictitious, as the true names and shield numbers are not presently known) (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

10. The true names and shield numbers of defendants CPT. MARK MOE, SGT. RICHARD ROE and P.O. JOHN DOE are not currently known to the plaintiff. However, all of said defendants are employees or agents of the NYPD. Accordingly, said defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to N.Y. G.M.L. § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiffs intend to name said officers as defendants in an amended pleading once the true names and shield numbers of said defendants becomes known to plaintiffs and (b) that the Law Department should immediately begin preparing their defense in this action.

11. The individual defendants are being sued in their individual and official capacities.

12. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers

of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

13. The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of plaintiff's rights.

14. At all relevant times, the individual defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

15. Plaintiff TREFFS was maliciously and falsely arrested by the individual defendants on January 1, 2012, at approximately 3:10 a.m. on East 13th Street at the corner of Second Avenue in the County and State of New York.

16. At approximately the time and place described, supra, plaintiff TREFFS was acting in his capacity as a trained National Lawyers Guild Legal Observer, as identified by his bright green hat embroidered in black thread with the words "National Lawyers Guild Legal Observer" and the Legal Observer identification card worn around his neck that hung in front of his chest.

17. Plaintiff TREFFS is one of many legal observers who volunteer their time at rallies organized by the Occupy Wall Street movement since its inception in September 2011.

18. The nation-wide National Lawyers Guild Legal Observer program, established in New York City in 1968 in response to antiwar and civil rights demonstrations, is part of the progressive bar association's ongoing commitment to advance and protect civil rights.

19. In New York City, police officers are familiar with the National Lawyers Guild Legal Observer program because Legal Observers and their green hats are present at many demonstrations. Legal Observers, when requested by demonstration organizers, attend demonstrations to document law enforcement conduct, including arrests, and their presence often discourages acts of police officers and other persons that would interfere with the demonstrators' free exercise of their constitutionally protected political views.

20. Further, the NYPD Patrol Guide states, "[the] City of New York permits properly identified observers free access through police lines at the scene of any demonstration….All members of the [NYPD] will extend every courtesy and cooperation to observers. Observers shall be permitted to remain in any area, or observe any police activity, subject only to restrictions necessitated by personal safety factors, as determined by the incident commander." See NYPD Patrol Guide section 213-11.

21. Plaintiff TREFFS has been a regular Legal Observer in New York City since he was trained on July 29, 2010.

22. On January 1, 2012, plaintiff TREFFS legal observed a march in the vicinity of Union Square by walking on the curbside of the sidewalk.

23. As the demonstrators walked on the sidewalk, a line of police officers on scooters followed beside the march. The officers on scooters often led the direction of the march by lining up their scooters so as to force the group of demonstrators to make a turn down another street.

24. After marching along several blocks, the police officers forced the group of demonstrators to walk north on the sidewalk located on the east side of Second Avenue.

25. Once Plaintiff TREFFS and the demonstrators reached the block between East 12th and East 13th Streets, a line of police officers on scooters followed the group onto the sidewalk and a line of white-shirted police officers prevented the group from crossing East 13th Street.

26. Plaintiff TREFFS recognized the NYPD was preventing the demonstrators' further movement, so he stepped away from the group in order to find a location on the sidewalk on the southeast corner of the intersection at East 13th Street and Second Avenue where he could more easily observe the police officers and their interactions with the demonstrators.

27. Plaintiff TREFFS stood on the sidewalk near where a NYPD van was parked so he could record the names of arrestees as they were pulled from the group of demonstrators penned in by the police officers on the block of Second Avenue between East 12th and East 13th Streets.

28. As each arrestee was walked to the van by a police officer, plaintiff TREFFS asked the arrestee, "What's your name?"  Because he was the only person standing on the sidewalk and he was easily identifiable to the arrested demonstrators by his green Legal Observer hat, plaintiff TREFFS did not need to identify his purpose to the arrestees and they all quickly responded to plaintiff TREFFS' inquiry as they were loaded into the police van.

29. After plaintiff TREFFS recorded on a sheet of paper approximately eight to 10 names during the course of 15 minutes, upon information and belief, defendant P.O. DOE, wearing a scooter helmet, pointed at plaintiff TREFFS and shouted, in sum and substance, "GET OUT OF HERE!  I DON'T WANT TO SEE YOU HERE!"

30. Plaintiff TREFFS immediately complied with defendant P.O. DOE's instructions and left his position on the sidewalk on the southeast corner of the intersection of East 13th Street and Second Avenue and walked across the street toward a location on the northeast corner of the intersection.

31. Approximately 45 seconds after reaching the other side of the street, plaintiff TREFFS received a phone call. As he stood in front of a parked car talking on his cellular phone, plaintiff TREFFS saw defendant P.O. DOE pointing and crossing the street toward him.

32. Defendant P.O. DOE shouted toward plaintiff TREFFS, in sum and substance, "PUT THE PHONE DOWN!" and began to grab for the plaintiff.

33. Immediately, the other individual defendants joined defendant P.O. DOE and charged toward plaintiff TREFFS, forcing his upper body onto the hood of the parked car, where they roughly grabbed plaintiff TREFFS' arms and forced them high behind his back and placed his wrists in plastic handcuffs.

34. One of the individual defendants grabbed plaintiff TREFFS' Legal Observer hat and notes, and threw them to the ground.

35. Plaintiff TREFFS' phone was picked up from the ground by one of the individual defendants and placed inside plaintiff TREFFS' backpack.

36. Plaintiff TREFFS was then placed into a police van and eventually driven to the 9th Precinct where he remained in police custody until approximately 8:00 a.m. when he was released with a Desk Appearance Ticket (Arrest No. M12600169-L) signed by defendant P.O. ELIAV, and charged under New York Penal Law § 240.20(6), to wit, disorderly conduct.

37. On February 29, 2012, the date scheduled for plaintiff TREFFS to be arraigned, plaintiff TREFFS appeared in court and learned from one of the court officers that the New York County District Attorney's Office had declined to prosecute him.

38. As a result of his arrest, plaintiff TREFFS spent approximately five hours in police custody.

## FIRST CLAIM
### DEPRIVATION OF RIGHTS
### UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

39. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

40. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person, including the excessive use of force; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent; (d) freedom from the lodging of false charges against him by police officers; (e) freedom from having police officers fabricate evidence against him; (f) freedom from deprivation of liberty without due process of law; and (g) freedom from abuse of process.

41. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
### SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
### UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

42. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

43. By failing to remedy the wrongs committed by his or her subordinates, in failing to properly train, screen, supervise or discipline his or her subordinates, and by personally participating in and ordering the constitutional injuries set forth above, D.I. MULLIGAN, SGT. MILLER, SGT. TORRES, CPT. TAYLOR, SGT. LAU, CPT. MOE and SGT. ROE caused damage and injury in violation of plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments.

44. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**THIRD CLAIM**
**FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983**

45. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

46. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

47. Defendants D.I. MULLIGAN, SGT. MILLER, SGT. TORRES, SGT. LAU, P.O. ELIAV, P.O. FERRER, CPT. TAYLOR, P.O. SANTOS, P.O. GONZALEZ, CPT. MOE and SGT. ROE were present for the above-described incident and witnessed another defendant, to wit, P.O. DOE unlawfully arrest the plaintiff.

48. Defendants' use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendants D.I. MULLIGAN, SGT. MILLER, SGT. TORRES, SGT. LAU, P.O. ELIAV, P.O. FERRER, CPT. TAYLOR, P.O. SANTOS, P.O. GONZALEZ, CPT. MOE and SGT. ROE failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by other individual defendants.

49. The arrests of plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendant CPT. TAYLOR, D.I. MULLIGAN, P.O. ELIAV, CPT. MOE and P.O. DOE which defendants SGT. MILLER, SGT. TORRES, SGT. LAU, P.O. ELIAV, P.O. FERRER, P.O. SANTOS, P.O. GONZALEZ and SGT. ROE knew to be false, yet defendants SGT. MILLER, SGT. TORRES, SGT. LAU, P.O. ELIAV, P.O. FERRER, P.O. SANTOS, P.O. GONZALEZ and SGT. ROE failed to take any action or make any effort to intervene, halt or protect plaintiffs from being unlawfully and wrongfully arrested and prosecuted.

50. Defendants D.I. MULLIGAN, SGT. MILLER, SGT. TORRES, SGT. LAU, P.O. ELIAV, P.O. FERRER, CPT. TAYLOR, P.O. SANTOS, P.O. GONZALEZ, CPT. MOE and SGT. ROE's violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and clearly unconstitutional arrest of plaintiff resulted in the injuries and damages set forth above.

### FOURTH CLAIM
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

51. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

52. All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY

which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

53. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

54. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

55. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a. Arresting Legal Observers, as documented in the following civil rights actions filed against the CITY:

        i. Wheeler v. City of New York, 07-cv-03999 (LBS) (S.D.N.Y.) (police officer grabs Legal Observer's bicycle chain she wears about her torso in order to pull her off her bicycle and uses chain to throw Legal Observer around, causing her to suffer injuries; and Legal Observer is brought to precinct, but released without charges filed against her)

        ii. Rankin v. City of New York, 06-cv-00362 (KMK) (S.D.N.Y.) (police officer pulls Legal Observer off his bicycle, arrests and swears out false complaint against him during Republican National Convention demonstration in 2004);

        iii. Garbini v. City of New York, 05-cv-1565 (KMK) (S.D.N.Y.) (during lawful demonstration, police officers indiscriminately arrest demonstrators and Legal Observers without probable cause and swear out false complaints)

    b. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

    c. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

      i.   in order to protect other officers; and/or

      ii.   in order to meet said productivity goals; and/or

d.   Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

e.   Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

f.   Retaliating against officers who report police misconduct; and

g.   Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

56. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

a.   <u>Schoolcraft v. City of New York</u>, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

b.   <u>Long v. City of New York</u>, 09-CV-6099 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, <u>to wit</u>, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

c.   <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

d.   <u>Lin v. City of New York</u>, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[1]

---

[1]     For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

e. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

f. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[2]

g. <u>Callaghan v. City of New York</u>, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, <u>to wit</u>, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[3]

h. <u>Williams v. City of New York</u>, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

i. <u>Dunlop v. City of New York</u>, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

---

[2]	For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[3]	For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

j.  Carmody v. City of New York, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

k.  MacNamara v. City of New York, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

l.  McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

m.  Avent v. City of New York, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

n.  Smith v. City of New York, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

o.  Powers v. City of New York, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

p.  Kunstler v. City of New York, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiff's political beliefs);

q.  Allen v. City of New York, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

r.  Dotson v. City of New York, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

s.  Nonnemann v. City of New York, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

t.  Richardson v. City of New York, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

u. <u>Barry v. New York City Police Department</u>, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

v. <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

w. <u>Walton v. Safir</u>, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

x. <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

y. <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

z. <u>Sorlucco v. New York City Police Department</u>, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

aa. <u>Kaufman v. City of New York</u>, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

57. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[4]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at."Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime.She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[5]

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[6]

d. The New York Daily News obtained and published two (2) internal memos, which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[7]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City

---

[4]     Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[5]     Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at*http://www.nydailynews.com/ny_local/ 2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

[6]     *Id.*

[7]     James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/ 2010-11-08_cops_told_to_meet_quotas.html.

subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[8]

f.  In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[9]

g.  In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[10]

h.  Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[11] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[12]

i.  The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct

---

[8]     Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

[9]     Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[10]    Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

[11]    William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[12]    Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[13]

    j.   Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[14]

58. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, inter alia, by the following:

    a.   The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become

---

[13]    *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

[14]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[15]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[16]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[17] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-

---

[15]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[16]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[17]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted <u>de facto</u> policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[18] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[19]

59. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

   a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[20]

> […]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This

---

[18]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.
[19]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.
[20]    Mollen Commission Report, p. 36.

attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[21]

b.  In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[22]

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[23] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

---

[21]   Mollen Commission Report, pp. 40-41.

[22]   Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[23]   Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[24]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[25]

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

---

[24]     *Id.*

[25]     John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[26]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[27]

f.  In early 2010, the CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer[28] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[29]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[30]

60.  The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia, by the following:

---

[26]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[27]    John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[28]    In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[29]    *Id.*

[30]    David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

61. The existence of the above-described unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

62. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in

order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

63. All of the foregoing acts by defendants deprived the plaintiffs of federally protected rights, including, but not limited to, the constitutional rights enumerated in paragraph "40" above.

64. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

65. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

66. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

67. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the

police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

68. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

69. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

## **JURY DEMAND**

70. Plaintiff demands a trial by jury in this action on each and every one of their damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.    For such other further and different relief as to the Court may seem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

Dated:   New York, New York
         August 20, 2012

                         Respectfully submitted,


By:          /s/
          David B. Rankin
          Deborah B. Diamant
          Law Office of Rankin & Taylor
          *Attorneys for the Plaintiffs*
          350 Broadway, Suite 701
          New York, New York 10013
          t: 212-226-4507